**J.A. RIGGS TRACTOR COMPANY,**
**Appellant,**

v.

**Michael W. ("Mike") BENTLEY,**
**Appellee.**

**No. 06–06–00046–CV.**

Court of Appeals of Texas,
Texarkana.

Submitted Dec. 6, 2006.
Decided Dec. 19, 2006.

James W. Smith, Dunn, Nutter & Morgan, LLP, Texarkana, for appellant.

Wade A. Forsman, Sulphur Springs, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

J.A. Riggs Tractor Company (Riggs) challenges the Texas court's personal jurisdiction in this breach of contract action. This is an accelerated interlocutory appeal. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014 (Vernon Supp.2006). The underlying case is a contract dispute between Michael W. Bentley, of Sulphur Springs, Texas, and Riggs, a Texarkana, Arkansas, company. Bentley alleges $74,000.00 in damages from Riggs' cancellation of a contract for a generator.

Riggs raises two main issues on appeal: (1) the trial court erred in finding specific personal jurisdiction; and (2) the trial court erred in finding general personal jurisdiction. Riggs does not raise a factual sufficiency argument, but asserts that the facts, as found, do not suffice to confer jurisdiction. We agree that Riggs lacks constitutionally cognizable minimum contacts with Texas to support either specific or general personal jurisdiction and that the trial court erred in denying Riggs' special appearance.

## I. STANDARD OF REVIEW

"Whether a court has personal jurisdiction over a defendant is a question of law." *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). On the underlying standard, the "plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute." *Id.* at 793. At that point, a "defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases." *Id.*

We conduct a de novo review of the trial court's denial of a special appearance. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex.2002). If we must review the facts underlying the legal conclusion, we review those for legal and factual sufficiency. *Marchand,* 83 S.W.3d at 794. Where the trial court issues findings of fact (as it did here), this Court reviews the trial court's legal conclusions drawn from the facts to determine their correctness. *Id.*

## II. DUE PROCESS AND PERSONAL JURISDICTION

### A. The Texas Long–Arm Statute

The Texas long-arm statute allows Texas courts jurisdiction over nonresident defendants doing business in Texas. Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1997). While the long-arm statute does enumerate certain examples of doing business, it does not provide an exclusive list. Tex. Civ. Prac. & Rem. Code Ann. § 17.042 ("In addition to other acts that may constitute doing business, a nonresident does business in this state if . . ." then setting out three acts); *see also Marchand,* 83 S.W.3d at 795; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356–57 (Tex. 1990). The statute is construed as ex-

tending Texas courts' jurisdiction over nonresident defendants as far as the federal constitutional requirement of due process permits. *Marchand,* 83 S.W.3d at 795; *Judd,* 8 S.W.3d at 441.

■ Riggs asserts that no contract was formed so as to confer jurisdiction under the section of the long-arm statute that defines contracting to perform in Texas as one method of "doing business." *See* Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1). The statute also specifies that "other acts" may constitute "doing business." Tex. Civ. Prac. & Rem.Code Ann. § 17.042. As just discussed, the caselaw interprets this statute as extending to the reaches of due process. "[T]he Texas long-arm statute requirements are satisfied if exercising jurisdiction comports with federal due process limitations." *Coleman,* 83 S.W.3d at 806. Bentley's pleadings alleged that Riggs "does business in Texas." Thus, we do not need to address, as preliminary matters, the underlying questions of whether there was a formal contract entered or if any contract was to be performed in Texas. Instead, these will be some of the factors considered in the due-process analysis, by considering the precedent from the United States Supreme Court and Texas decisions. *See Marchand,* 83 S.W.3d at 795.

**B. Due Process and "Minimum Contacts"**

■ "The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). A Texas court's personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with Texas, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Marchand,* 83 S.W.3d at 795 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The "touchstone" of the minimum contacts analysis is purposeful availment, i.e., that "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

■ The purposeful availment analysis has three components. *See Holten,* 168 S.W.3d at 785. First, the purposeful availment requirement ensures that a nonresident defendant's contacts with the forum state resulting from the unilateral activities of another party or a third person will not be the sole basis of haling that defendant into the jurisdiction. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Holten,* 168 S.W.3d at 785. Thus, we look at only the defendant's contacts with the forum. *Holten,* 168 S.W.3d at 785. Second, the contacts must be "purposeful" rather than random, isolated, or fortuitous. *Rudzewicz,* 471 U.S. at 462, 105 S.Ct. 2174; *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Holten,* 168 S.W.3d at 785. In the context of a sale, this purposeful and deliberate contact is found by "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state.'" *Holten,* 168 S.W.3d at 785 (quoting *Rudzewicz,* 471 U.S. at 473, 105 S.Ct. 2174). Third, the defendant must have "availed" itself of the jurisdiction by seeking some benefit, advantage, or profit from the forum state so as to consent to suit there. *Holten,* 168 S.W.3d at 785. Conversely, "a nonresident

may purposefully avoid a particular jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction." *Id.*

**C. Specific vs. General Personal Jurisdiction**

 "Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction." *Marchand,* 83 S.W.3d at 795. Specific jurisdiction exists when the defendant's alleged liability "arises from or is related to an activity conducted within the forum." *Id.* at 796. In other words, the cause of action must arise from, or relate to, the defendant's purposeful contacts. *Schexnayder v. Daniels,* 187 S.W.3d 238, 243 (Tex.App.-Texarkana 2006, pet. dism'd w.o.j.).

 General jurisdiction, on the other hand, may exist even if the cause of action does not relate to or arise from the nonresident defendant's contacts with the forum, so long as the defendant's contacts are "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Marchand,* 83 S.W.3d at 797; *Schexnayder,* 187 S.W.3d at 243. General jurisdiction requires a showing that the defendant conducted "substantial activities" within the forum, which requires a more demanding minimum contacts analysis. *Coleman,* 83 S.W.3d at 807; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 228 (Tex.1991). Thus, general jurisdiction presents a "more onerous" burden of proof. *Marchand,* 83 S.W.3d at 797. In essence, under general jurisdiction, the contacts "should be such as to justify categorizing the defendant as a resident of this State." *Schexnayder,* 187 S.W.3d at 243. "[O]ne suggested method of determining whether general jurisdiction over a defendant truly lies in Texas is by determining whether a citizen of another state, on a claim for wrongdoing in another state, could nevertheless properly sue the defendant in Texas courts." *Schexnayder,* 187 S.W.3d at 243 (citing Charles Rhodes, *The Predictability Principle in Personal Jurisdiction Doctrine: A Case Study on the Effects of a "Generally" too Broad, but "Specifically" too Narrow Approach to Minimum Contacts,* 57 Baylor L.Rev. 135, 149–55 (2005)).

**III. ANALYSIS: SPECIFIC JURISDICTION**

**A. The Contacts**

Riggs is an Arkansas corporation with its principal (and apparently only) place of business in Arkansas. Riggs does not have Texas residency, a registered agent in Texas, a Texas place of business, or any employees or servants in Texas. Per its Caterpillar tractor franchise territory agreement, Riggs has structured its business to sell only in Arkansas. Though Riggs' executive vice president testified that they can sell to anyone who walks into the shop in Arkansas, he said that, if a Texas resident called them, they would "hand them off" either by referring them or calling the Texas Caterpillar dealer (Holt). He stated this was "a rule. We have to do that .... because of sales territory, franchise territory."

Bentley initiated the contact with Riggs. Bentley had been looking for a generator as a component of his bid on the City of Sulphur Springs' homeland security power failure preparedness project. Bentley had found Riggs' website, which is "informational in nature. You can go there and find out information about products." Riggs' marketing manager testified the website makes no sales promotions and does not solicit business. In other words, it appears that an order cannot be placed

on the website. Accordingly, after finding the website, Bentley telephoned Riggs and requested a quote on a generator. A Riggs employee "told him I would be happy to quote him, but I would need to see a set of specifications."[1] Bentley faxed the specifications for the generator to Riggs.[2]

Riggs faxed back to Texas a quote for $16,090.00.[3] Bentley used this component price in his project bid and was the city's low bid. In early January 2005, Bentley called Riggs to inform them he had won the bid and to accept the quote. Riggs requested Bentley complete a credit application, which would have to be approved in order to transact any business, and faxed the application to Texas. Riggs says, at this point, they were still not transacting business, not doing business, because it was just a "prospect, possible purchaser if everything was approved by—by the company." Bentley says he completed the application (without mentioning the date he completed it) and faxed it to Riggs and that, "I know that Riggs Tractor received it because I got a confirmation sheet." This confirmation sheet is not in the record, and Riggs denies ever receiving the completed credit application.

Nonetheless, in early February 2005, Bentley spoke with Riggs by telephone and Riggs requested that Bentley get a trailer from Oklahoma to bring to Arkansas to pick up the generator. Bentley agreed. In late February 2005, Riggs realized it had transposed the "1" and "6" in its quote for the $61,090.00 generator, told

Bentley they misquoted, and demanded more money. In March 2005, Bentley called Riggs to inquire as to delivery, and Riggs informed Bentley the order was cancelled. Bentley sued on one count of breach of contract.

Bentley was required to arrange to come to Arkansas for delivery. Additionally, the credit agreement states: "All obligations of the undersigned under this Guaranty are to be performed at the office(s) of Riggs in Little Rock, Pulaski County, Arkansas." The credit agreement also contains an optional forum selection clause. It allows that the "VENUE FOR ANY SUCH ACTION [under the credit agreement] MAY, AT THE SOLE OPTION OF THE PARTY INSTITUTING THE ACTION, BE IN PULASKI COUNTY, ARKANSAS."

## B. The Sufficiency of the Contacts

The trial court found that Riggs' contacts with Texas were purposeful in that "Riggs was actively participating in the sale" by sending a quote to Texas and sending a credit application to Texas. However, the court then went on to describe other aspects of "actively participating in the sale" in support of specific jurisdiction that have nothing to do with contacts with Texas: "by asking Bentley to pick up a certain trailer in Oklahoma and otherwise make arrangements for pick up and delivery" (which were all to be done outside of Texas). On these same facts (calling and faxing Texas and requesting that Bentley go to Oklahoma for

---

1. Riggs' vice president testified that Riggs, per its franchise agreement, referred Bentley to the Texas dealer, Holt. After Riggs notified the Texas dealer, the Texas dealer "said go ahead and do business with him. We don't want to do business with him." The record does not indicate when in time this occurred.

2. Riggs said Bentley faxed only a one-page standard Caterpillar generator brochure,

while Bentley says he faxed the full City of Sulphur Springs specifications.

3. As Riggs denies having received from Bentley proper specifications, Riggs characterizes this as a "quotation that had a quote, unquote, laundry list of options and asked him if that would cover the items that he needed.... He said yes."

a trailer to bring for delivery in Arkansas), the trial court found that Riggs could have foreseen/reasonably anticipated defending a lawsuit in Texas.

Bentley strives to draw out the evidence to show that Riggs' "active [participation] in the sale" involved extensive contacts with Texas: Riggs had a website from which a Texas resident learned of its products; Riggs continued to pursue a sale with Bentley, even knowing that he was not in Riggs' state/franchise jurisdiction; Riggs faxed a quote to Texas; and Riggs followed up with several telephone calls to Texas. Bentley asserts that these multiple telephone calls and faxes require this Court to find jurisdiction through a "straightforward application" of our *Schexnayder* decision. *See Schexnayder,* 187 S.W.3d 238. However, the minimum contacts analysis "is not susceptible of mechanical application." *Kulko v. Superior Court of Cal.,* 436 U.S. 84, 92, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

Moreover, the *Schexnayder* case is easily distinguishable. In that case, we found jurisdiction over Dr. Schexnayder in a medical malpractice action from Schexnayder's direction, via three telephone calls from Arkansas, of a medical team's actions in Texas. *Schexnayder,* 187 S.W.3d at 246. Bentley is mistaken that *Schexnayder* stands for the premise that multiple telephone calls in and of themselves constitute minimum contacts. Indeed, the Texas Supreme Court has noted otherwise when it stated that changes in technology, such as cell phones and call forwarding, "have made reliance on phone calls ... as proof of purposeful availment obsolete." *Holten,* 168 S.W.3d at 791; *see also Laykin v. McFall,* 830 S.W.2d 266 (Tex.App.-Amarillo 1992, no pet.). Rather, the actions of Schexnayder in directing the medical team by telephone *were* the contacts, and those contacts *were* the alleged tort, i.e., the alleged negligent conduct. *Schexnayder,* 187 S.W.3d at 245–46.

This is not a tort case, where the call/contact constitutes the cause of action. Bentley does not claim a cause of action arising out of any one of those calls individually. Rather, all of Riggs' telephone contacts with Bentley in Texas still only relate to one isolated sale of one piece of machinery on one contract, if that contract exists at all, on which Bentley sued. The law is well settled that, absent other contacts, there is "no purposeful availment in cases involving isolated sales solicited by consumers who proposed to use the product in a state where the defendant did no business." *Holten,* 168 S.W.3d at 786.

Texas generally requires "additional conduct" beyond the facts of a single sale on a single contract to establish jurisdiction. *See id.* "Thus, a nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here in disputes arising from that business." *Id.* at 785. This additional conduct requirement may be met through evidence of a sales and distribution network the defendant operates in the forum state. *Id.* (citing *Washington,* 326 U.S. at 320, 66 S.Ct. 154). Evidence of this may include resident salesmen who exhibit samples and solicit orders within the forum state, advertising in telephone directories in Texas cities, operating an office for sales information and support, certain activities over the internet, and the design or distribution of products in the state. *Holten,* 168 S.W.3d at 785–86.

This case presents very similar facts to those in *Holten:* the underlying dispute concerns an attempted purchase by a Texas resident from a nonresident company; the sale in both cases was initiated by the Texas purchaser; the nonresident seller in both cases knew the product was going to, and would be used in, Texas; payment in

both cases (in *Holten*, actual payment, and here, anticipated payment) was in the foreign state. *Id.* at 784, 787. There are some differences here that indicate slightly greater contacts between Riggs and Texas than in the *Holten* case: Michiana did not advertise in Texas, either on the internet or otherwise, but Riggs did, although neither Michiana nor Riggs solicited business through advertising to the particular Texas buyer. *Id.* at 784. There are, additionally, some differences that demonstrate even less contacts here than in *Holten:* the sale actually occurred in *Holten,* while it was never consummated here; and delivery in *Holten* was to Texas, while, here, anticipated delivery was in Arkansas. *Id.*

■■■ Unlike Michiana, which did no advertising of any kind in Texas, Riggs did engage in some marketing-oriented activities in Texas. Riggs advertised in Texas through (a) its website; (b) the Texarkana telephone book; and (c) mailings sent outside of Arkansas, though the evidence did not specify that these went to Texas. Since there is no evidence that either the mailings or the telephone book listings relate to the sale to Bentley, they are not relevant to the specific jurisdiction analysis. *See id.* at 785; *Marchand,* 83 S.W.3d at 796. The evidence indicates Riggs' website relates to the Bentley sale and is, therefore, relevant to the specific jurisdiction analysis.

■■■ "Internet use is characterized as falling within three categories on a sliding scale for purposes of establishing personal jurisdiction." *Michel v. Rocket Eng'g Corp.,* 45 S.W.3d 658, 677 (Tex.App.-Fort Worth 2001, no pet.) (citing *Jones v. Beech Aircraft Corp.,* 995 S.W.2d 767, 772 (Tex.App.-San Antonio 1999, pet. dism'd w.o.j.)). "At one end of the scale are websites clearly used for transacting business over the internet, such as entering into contracts and knowing and repeated transmission of files of information, which may be sufficient to establish minimum contacts with a state." *Schexnayder,* 187 S.W.3d at 248 (citing *Michel,* 45 S.W.3d at 677). In the middle are "interactive" websites, in which a potential customer and a host computer may exchange information, with jurisdiction in these cases determined by the degree of interaction. *Schexnayder,* 187 S.W.3d at 248 (citing *Michel,* 45 S.W.3d at 677). "On the other end of the spectrum are 'passive' websites that are used only for advertising over the internet and are not sufficient to establish minimum contacts, even though they are accessible to residents of a particular state." *Schexnayder,* 187 S.W.3d at 248 (citing *Michel,* 45 S.W.3d at 677). The uncontroverted evidence indicated that Riggs' website was on the "passive" end of the continuum. With candor to this Court, Riggs admitted that visitors to the site may click on a link to e-mail the webmaster or a manager, a fact not in the record below. The evidence does not indicate, however, that Bentley actually clicked on those links. Even recognizing this elevated level of interactivity, "the main thrust of the website is informational in nature." *Schexnayder,* 187 S.W.3d at 249. We do not find the website interactivity to rise to a level indicating Riggs' purposeful availment of the Texas market so as to constitute an "additional contact" justifying specific jurisdiction. *See id.*

■■■ In light of the scanty evidence in support of Riggs' purposeful availment, we note that the forum selection clause in the credit agreement suggests that Riggs anticipated suit in Arkansas and further suggests that Riggs was not availing itself of the benefit of Texas' laws. Although forum-selection clauses are not dispositive, they "should not be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a

State's laws.' " *Holten,* 168 S.W.3d at 792 (quoting *Rudzewicz,* 471 U.S. at 482, 105 S.Ct. 2174).

■ Given the absence of Riggs' constitutionally cognizable contacts with Texas relating to the sale, we are left with the same scenario the Supreme Court of Texas addressed in *Holten:* other than the one-time buyer's fortuitous presence in Texas, and decision to place his order from there, there is no evidence of any other connection between Riggs, the sale, and the State of Texas. *See Holten,* 168 S.W.3d at 794. Riggs, therefore, lacks the necessary minimum contacts sufficient to satisfy due process in invoking specific jurisdiction.

## IV. ANALYSIS: GENERAL JURISDICTION

### A. The Contacts

In support of a finding of general jurisdiction, Bentley introduced, in addition to those contacts addressed above in support of specific jurisdiction, evidence of Riggs' yellow and white page listings in (1) 2005–2006 "Texarkana Metro" telephone book; (2) December 2004–December 2005 "Texarkana" telephone book; and (3) 2001–2002 "Greater Texarkana" telephone book. The evidence shows that all of these telephone books cover both of the Texarkanas, i.e., Texarkana, Texas, and Texarkana, Arkansas, in addition to surrounding areas in both states. Riggs' marketing manager testified that it is not possible to list a telephone number in a Texarkana telephone book without the listing being in a telephone book covering and being distributed in both states. He stated that he has no control of the distribution of the Texarkana telephone book to the Texas side. He agreed that the yellow page advertisement in the Texarkana telephone book "is not only foreseeable but virtually certain that this advertisement is going to find its way into the hands of Texas citizens."

However, he testified that Riggs' telephone book advertisement was aimed at "[t]he Texarkana resident in the state of Arkansas" and not at any Texas resident.

Bentley also introduced evidence that approximately eight percent of Riggs' outbound calls from September 2003 to January 2004 were to Texas. At the hearing, Riggs explained that an Arkansas company might have that many calls to Texas because Texarkana, Arkansas, and Texarkana, Texas, share a border. He explained that "you can't even call for lunch to be brought in for a meeting without calling somewhere in Texas to get a lunch catered," depending on what you would like to have for lunch. He also explained that Riggs' "employees have family and we don't restrict their calls." Additionally, however, he testified that there are "people from Texas that own Caterpillar machines" to whom Riggs may return telephone calls.

### B. The Sufficiency of the Contacts

■ In a general personal jurisdiction analysis, "we do not view each contact in isolation. All contacts must be carefully investigated, compiled, sorted, and analyzed for proof of a pattern of continuing and systematic activity." *Coleman,* 83 S.W.3d at 809. In so doing, we look at the "quality," not just quantity, of the contacts. *Id.* Even so, we must note that the quantity here is very low. *See generally Hall,* 466 U.S. 408, 104 S.Ct. 1868 (eighty percent, or $4 million, in sales insufficient for general jurisdiction); *see also Keeton,* 465 U.S. at 779, 104 S.Ct. 1473 (monthly sale of 15,000 magazines "may not be so substantial as to support jurisdiction over a cause of action unrelated to those activities" as in general jurisdiction); *Dominion Gas Ventures v. N.L.S., Inc.,* 889 F.Supp. 265 (N.D.Tex.1995) (four to seven percent of business' work in Texas insufficient for

general personal jurisdiction). An important factor in assessing the quality of the contacts is to view them in the context of the structuring of the defendant's transactions. *Holten*, 168 S.W.3d at 785; *Coleman*, 83 S.W.3d at 808 (citing *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir.1987)).

While Riggs' decision to advertise and list itself in the Texarkana telephone books—thus advertising in both Texas and Arkansas—was not accidental or random, Riggs asserts that the advertising in Texas resulting from those listings is still fortuitous and/or attenuated. As there appears to be only one telephone book by any company for both cities (i.e., Texarkana, Texas, and Texarkana, Arkansas), Riggs essentially asks this Court to ignore that contact with Texas from the listing as a necessary by-product of the Arkansas listing. The combined telephone book presents one of what we have previously termed the "unique characteristics of the City of Texarkana as a community straddling the state line between Texas and Arkansas." *Greenwell v. Davis*, 180 S.W.3d 287, 296 (Tex.App.-Texarkana 2005, pet. denied). "Although one community, Texarkana consists of two separate cities located not only in separate counties, but in separate states." *Id.* Bentley, on the other hand, would have Texas assert general jurisdiction over any Texarkana, Arkansas, company that purposefully listed itself in the Texarkana telephone book. As such, all Texarkana, Arkansas, companies listing themselves in their local telephone book would potentially subject themselves to suit by any resident of any state on any matter. *See* Rhodes, 57 Baylor L.Rev. at 149–55.

■ "Incidental" means "1. happening or likely to happen in an unplanned *or*

*subordinate* conjunction with something else. 2. incurred casually and in addition to the regular or main amount." Webster's Unabridged Dictionary 966 (2d ed.2001) (emphasis added). We find that Riggs' availment of Texans through its listing in its local telephone book—which includes both Texas and Arkansas cities—is incidental. Although not "fortuitous,"[4] we find that, in a minimum contacts analysis, incidental contact is attenuated. "Attenuate" means "1. to weaken or reduce in force, intensity, effect, quantity … 2. to make thin; make slender or fine." Webster's Unabridged Dictionary 133 (2d ed.2001). In the minimum contacts context "attenuated" refers to those contacts that are weak, thin, or slender. The incidental contacts with Texas by advertisement in the combined telephone books are weak and slender contacts in force, intensity, and effect and do not support general jurisdiction. *Cf. Saudi v. S/T Marine Atl.*, 159 F.Supp.2d 469, 481–82 (S.D.Tex.2000).

■ Similarly, the evidence of Riggs' outbound telephone calls to Texas does not indicate Riggs' purposeful availment of that market. The eight percent of calls from Riggs to Texas do not differentiate between personal and business, purchases and sales, or Riggs-initiated and customer-initiated. The evidence indicates that the calls do not, as a rule, involve Riggs' availment or solicitation of the Texas market. Again, the contact is largely incidental. Riggs' vice president's comment that he did not think buying lunch in Texarkana, Texas, constitutes a Texarkana, Arkansas, company's "doing business" in Texas mirrors the United States Supreme Court's conclusion on the matter. The Court has noted that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction" in a

---

**4.** "Occurring by chance." Black's Law Dictionary 680 (11th ed.2004).

general jurisdiction analysis. *Hall,* 466 U.S. at 418, 104 S.Ct. 1868; *see also Saudi,* 159 F.Supp.2d at 481–82 (receipt of food and supplies from Texas fortuitous and insufficient to impose general personal jurisdiction). "Such incidental commerce does not give rise to general personal jurisdiction." *Saudi,* 159 F.Supp.2d at 481. In other words, the focus of the inquiry for general jurisdiction is doing business *in,* not doing business *with,* Texas.

Bentley also asserts, in support of general jurisdiction, that Riggs mailed some promotional materials out of the State of Arkansas. As a rule, Riggs weeded out non-Arkansas zip codes from its advertising mailings. However, on request, it would mail one out of state. There is no evidence, though, that any of these were mailed to Texas. As such, evidence of the mailings is insufficient in supporting a finding that Riggs purposefully availed itself of Texas. *Accord Keeton,* 465 U.S. at 779, 104 S.Ct. 1473 (nationwide magazine insufficient to confer general jurisdiction).

 Rather than serving as evidence of Riggs' availment of Texas, the fact that Riggs weeded out non-Arkansas zip codes supports a finding that Riggs structured its business so as to avoid the Texas market. *See, e.g., Holten,* 168 S.W.3d at 785. "When a nonresident defendant purposefully structures transactions to avoid the benefits and protections of the forum's laws, the legal fiction of consent no longer applies." *Coleman,* 83 S.W.3d at 808. In addition to the mailings, Riggs referred clients to Holt of Longview (and vice versa) to maintain a separation of territory. Though Riggs, at times, would take orders from a Holt dealer in Texarkana, Texas, the evidence indicated that Riggs insisted on performance of these sales in Arkansas. Riggs' employee testified that "Holt has a dealership store right across the border, and if that store didn't have parts and they had an extensive machine down they called us. We would call them back, answer if we had the part, and *then they come over and pick it up."* (Emphasis added.) Though Riggs had been given permission and did continue to pursue the sale with Bentley, in apparent violation of its rule on the territorial agreement, Riggs still insisted on Bentley traveling to Arkansas to complete the sale. This effort to otherwise avoid the market should be recognized when evaluating an isolated sale to that market. *See Chung v. NANA Dev. Corp.,* 783 F.2d 1124, 1128 (4th Cir.1986).

We find that the evidence, in total, shows Riggs' structured effort to avoid that Texas market. We are unable to discern—in the telephone books, website, mailings, and outgoing calls and faxes—a "pattern of continuing and systematic activity" within the State of Texas. *Coleman,* 83 S.W.3d at 809. The evidence is too insubstantial to show continuous and systematic contact with Texas in support of general jurisdiction.

## V. CONCLUSION

Having found that Riggs has insufficient contacts to support Texas' specific or general jurisdiction, we do not need to analyze the second prong of the due-process analysis, i.e., that exercising such jurisdiction comports with "fair play and substantial justice." *See Rudzewicz,* 471 U.S. at 475–76, 105 S.Ct. 2174; *Marchand,* 83 S.W.3d at 795; *Guardian Royal Exch. Assurance,* 815 S.W.2d at 226. The exercise of personal jurisdiction over Riggs, under either a specific or general theory, would entail Texas' overreaching beyond the limits required by our status as a co-equal sovereign in a federal system. *See Woodson,* 444 U.S. at 292, 100 S.Ct. 559; *Holten,* 168 S.W.3d at 793.

We reverse the trial court's judgment denying the special appearance and finding jurisdiction, and render judgment dismissing the claim for want of jurisdiction.