COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| ZINC NACIONAL, S.A., | § | |
| Appellant, | § | No. 08-07-00314-CV |
| | § | Appeal from |
| v. | § | 34th District Court |
| BOUCHÉ TRUCKING, INC., | § | of El Paso County, Texas |
| Appellee, | § | (TC # 2001-4505) |
| v. | § | |
| JORGE ARRELLANO, | § | |
| Party In Interest/Plaintiff. | § | |
| | § | |

**OPINION ON REMAND**

Zinc Nacional, S.A. brings this interlocutory appeal from the denial of a special appearance. At issue is whether a Mexican company that trucks its product into the United States at Laredo, Texas for transport to New Mexico may be sued in Texas for negligence in loading the trailer at its facility in Monterrey, Mexico which allegedly caused an accident that injured a Texas driver. In our original opinion issued July 31, 2009, we concluded that the trial court could exercise personal jurisdiction on the basis of specific jurisdiction. On April 9, 2010, the Texas Supreme Court determined that Zinc did not have minimum contacts with Texas for purposes of establishing specific jurisdiction by using a third-party trucking service to transport its goods through Texas to an out of state customer. *Zinc Nacional, S.A. v. Bouché Trucking, Inc.,* 308 S.W.3d 395, 396 (Tex. 2010). It remanded the case to us for consideration of Bouché's alternative jurisdictional argument.

# FACTUAL SUMMARY

For the benefit of the reader, we will reiterate the precise factual background. Zinc Nacional is a Mexican corporation with its principal place of business in Monterrey, Mexico. The company manufactures paper and paper-related products for worldwide distribution. It does not maintain an office in Texas, employ anyone in Texas, advertise in Texas, or market its products in Texas. Zinc has some 260 customers worldwide, thirty of which are located in the United States, and three or four of which are located in Texas. It also receives raw materials from suppliers in Texas. Zinc contracts with C.H. Robinson de Mexico, a Mexican entity, for the transportation of its products throughout Mexico.

Zinc focuses on selling its products to drywall manufacturing plants located in New Mexico, Nevada, and Florida. American Gypsum, located in Albuquerque, New Mexico, has been a customer of Zinc's grey-back paper products for the past seven years. Zinc ships American Gypsum approximately 300 metric tons of product per month. On average, it ships two to three loads a week.

On December 13, 1999, Zinc loaded eight rolls of grey-back paper onto a trailer in Monterrey, Mexico, pursuant to a purchase order from American Gypsum.[1] The trailer was provided by C.H. Robinson. C.H. Robinson trucked the load from Monterrey, Mexico, to the international bridge at Laredo, Texas. At that point, the customary procedure was to deliver the load to a customs agent in order to cross the shipment into the United States. In this case, the customs agent was Juan Alvarado Brokerage. The purchase order specified that the shipping terms were "F.O.B. Mid-Bridge Laredo." This ensures, in effect, that the transfer of title took place in Nuevo Laredo, Tamaulipas,

---

[1] Because of the size and weight of the rolls, Zinc loads them onto a trailer using a specialized forklift loader. The rolls are then secured using specialized supports and inflatable pillows purchased and provided by Zinc to ensure that the rolls do not shift during transport. This particular load weighed between 2.5 and 3 metric tons. Because the paper is delicate and fragile, the rolls are to remain on the same trailer from the time of loading in Monterrey until they are unloaded in New Mexico by the same specialized forklift owned by American Gypsum.

Mexico. The shipment was then picked up in Laredo by Bouché Trucking, Inc.--a Texas corporation--which had been subcontracted by C.H. Robinson to transport the products to New Mexico.

Jorge Arrellano is a long haul truck driver for Bouché. On December 14, 1999, Arrellano was instructed to pick up a load containing numerous rolls of grey-back paper for transport to American Gypsum in Albuquerque. During transport, the rolls shifted causing the trailer rig to overturn in Texas on U.S. 55 North. Arrellano sued Bouché, alleging it was negligent in: (1) failing to properly load the rolls of paper onto the trailer, (2) failing to properly secure the rolls of paper onto the trailer, and (3) failing to properly hire and/or train its personnel and/or its agents on the proper manner of loading. Bouché then filed a third party petition against Zinc Nacional seeking indemnity and contribution since Zinc employees actually loaded the paper rolls onto the trailer.[2] Zinc filed a special appearance which the trial court denied.

## STANDARD OF REVIEW

The plaintiff bears the initial burden of pleading sufficient allegations to bring a non-resident defendant within the personal jurisdiction of a Texas court. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333 (Tex. 2009); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex.2002). The non-resident defendant then assumes the burden of negating all bases of jurisdiction in those allegations. *Id.*

Whether a trial court has personal jurisdiction over a defendant is a question of law, which we review *de novo*. *Retamco*, 278 S.W.3d at 337. However, the trial court frequently must resolve questions of fact before deciding the question of jurisdiction. *BMC Software*, 83 S.W.3d 794. If a

---

[2] During oral argument, we were advised that Zinc created a new product line specifically for American Gypsum and that every roll of paper is unique pursuant to specifications. The round rolls of paper are contained in square boxes and each load is sealed in Monterrey before transport.

trial court enters an order denying a special appearance, and the trial court issues findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *Id*. Where, as here, the trial court does not issue findings, all fact findings necessary to support the judgment and supported by the evidence are implied. *Id*. at 795.

## LONG-ARM JURISDICTION

Texas courts may assert *in personam* jurisdiction over a non-resident if (1) the Texas long-arm statute[3] authorizes the jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due process guarantees. *Retamco*, 278 S.W.3d at 337, *citing Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990). The long-arm statute permits Texas courts to exercise jurisdiction over non-resident defendants that do business in Texas, and the statute contains a non-exclusive list of activities that constitute "doing business". TEX.CIV.PRAC.&REM.CODE ANN. § 17.042 (Vernon 2008). A non-resident does business in Texas if it commits a tort in whole or in part in the state. TEX.CIV.PRAC.&REM.CODE ANN. § 17.042(2). A tort is committed where the resulting injury occurs. *Hupp v. Siroflex of America, Inc*., 848 F.Supp. 744 (S.D.Tex. 1994), *citing Union Carbide Corp. v. UGI Corp*., 731 F.2d 1186, 1189-90 (5th Cir. 1984).

Section 17.042's broad language extends personal jurisdiction "as far as the federal constitutional requirements of due process will permit." *BMC Software*, 83 S.W.3d at 795, *quoting U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977). Consequently, we consider whether it is consistent with federal constitutional requirements of due process for Texas courts to assert *in personam* jurisdiction. *See Guardian Royal Exchange Assurance, Ltd. v. English China Clays*, 815 S.W.2d 223, 226 (Tex. 1991). We rely on both federal and Texas decisions in

---

[3] TEX.CIV.PRAC.&REM.CODE ANN. §§ 17.041-.045 (Vernon 2008).

determining whether a non-resident defendant has met its burden to negate all bases of jurisdiction. *BMC Software*, 83 S.W.3d at 795.

## MINIMUM CONTACTS

The United States Supreme Court divides the due process requirement into two parts: (1) whether the non-resident defendant has purposefully established minimum contacts with the forum state, and if so, (2) whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BMC Software*, 83 S.W.3d at 795, *citing International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed 95 (1945). We focus on the defendant's activities and expectations when deciding whether it is proper to bring the defendant before a Texas court. *Retamco*, 278 S.W.3d at 338. A defendant establishes minimum contacts when it "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* Personal jurisdiction exists if the non-resident's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Id.; BMC Software*, 83 S.W.3d at 795-96, *citing Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Inasmuch as the Supreme Court has already determined that the trial court erred by exercising specific jurisdiction over Zinc, we limit our analysis to general jurisdiction. General jurisdiction exists when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *BMC Software*, 83 S.W.3d at 796.

### The Issue on Remand

Here, there is no evidence that Zinc has attempted to serve the market in Texas. It has no offices, employees, agents, or representatives in Texas, nor does it advertise or market its paper products here. As such, Zinc lacks the minimum contacts with

Texas necessary to establish specific jurisdiction. Although Zinc does have three or four customers for its other products in Texas, and does receive some raw materials from Texas, these facts are unrelated to the accident in this case and are thus irrelevant to the question of specific jurisdiction. However, they may have some bearing on the existence of general jurisdiction, an issue the court of appeals did not consider.

*Zinc*, 308 S.W.3d at 398.

*The Record*

At the special appearance hearing in the trial court, the parties stipulated that the only evidence to be considered was the affidavit and deposition of Eduardo Alverde Villareal, Zinc's general manager, and the exhibits thereto. The following specifics appear in the affidavit.

3. ZINC is not a Texas resident, does not maintain an office in the State of Texas, nor does it employ any person in the State of Texas. ZINC does not advertise or market its products in the State of Texas.

4. ZINC is a manufacturer of paper and ZINC related products with its manufacturing plant located in Monterrey, Mexico. ZINC sells its products to distributors worldwide. ZINC's customer base totals approximately 260 customers worldwide. Of those 260 customers, approximately 30 are located in the United States. ZINC does sell to three or four customers located in Texas. However, Zinc's practice is to transfer title in Mexico. Moreover, neither I, nor anyone who works for Zinc has personal knowledge that any of the customers are Texas residents as defined by Texas law. Zinc does receive some raw materials from suppliers in Texas. However, the practice of Zinc is to accept title to the materials in Mexico. Zinc only receives a small amount of its raw materials from suppliers in Texas. Neither I, nor anyone who works for Zinc has any personal knowledge as to whether any of the suppliers are Texas residents as defined by Texas law.

5. . . . To my knowledge, ZINC does not enter into any contracts with Texas trucking companies. In short, ZINC does not maintain continuous and systematic contacts with the State of Texas.

During his deposition, Alverde testified that:

• Zinc is not licensed to do business anywhere in the United States.

• Zinc has never filed a claim or action against any company or entity in the United States.

• Zinc has never owned any real estate, personal property, or tangible property in the United

States.

• Zinc only pays for shipments to be delivered to Nuevo Laredo, Mexico or mid-bridge.

• Zinc only does business in Mexico.

• The customer pays for the shipment from Nuevo Laredo to "their final destiny" [sic]; hires the trucking services, and negotiates the price.

In its response to the special appearance, in its arguments at the hearing, and in its briefing on appeal, Bouché has consistently based its general jurisdiction argument on these limited facts:

• Zinc Nacional ('Zinc') has been doing business with customers in the United States for nine to ten years. Mr. Villareal[4] and his managers and staff visit a customer in the United States one to two times per month and stay two to three days during each visit.

• Zinc has been selling products in the United States since the 1970's.

• Zinc's markets in the United States are New Mexico, primarily, Nevada and Florida.

• Zinc takes orders and receives all orders from the United States in Monterey [sic], Mexico.

• Zinc has customers around the United States and representatives of Zinc visit their Customers, they deliver product specifications [sic].

• Zinc has a website and its customers or prospective customers can log onto their website to look at product specifications. The Zinc website is available in the United States.

• However orders are not taken through the website. Orders must be placed by faxing purchase orders to Zinc's headquarters in Monterey [sic], Mexico.

• One of the products produced by Zinc Nacional is gray back paper and it has been producing this product for approximately seven years.

• Zinc has only three customers for the gray back paper, one in New Mexico (two different sites in New Mexico), two cites [sic] in Mexico.

---

[4] The general manager's name is Eduardo Alverde Villareal. In keeping with Mexican custom, he goes by Alverde.

• American Gypsum ('AG') is a New Mexico company and has been a customer of Zinc since Zinc was started. AG is Zinc's second biggest customer.

• The monthly average shipment for AG for the seven years that AG has been doing business with Zinc is fifty (50) tons per month. However, the quantity of Zinc gray paper product ordered by AG is closer to three hundred (300) tons per month and the price per ton is around $300 per ton.

• Zinc sells both types of its gray back paper to AG.

• Zinc agents communicate regularly, one or two times per week, with AG representatives in New Mexico with the communications involving payments and shipments of products from Monterey [sic], Mexico to New Mexico, one of AG's two sites in New Mexico.

• Mr. Villareal confirmed that the documents attached hereto as Exhibit B are true and accurate depictions of the Zinc website. The documents attached hereto as Exhibit B are incorporated herein by reference for all purposes as if recited verbatim herein.

• Zinc formed 'Promax' with other Mexican companies and Promax sells its products to foreign markets.

• Zinc is a member of the American Zinc Association. The American Zinc Association has its headquarters in Washington, D.C. Zinc has been a member of the American Zinc Association for at least three years.

• Zinc has had the referenced website available since the year 2000.

• The documents attached as Exhibit B accurately reflect the Zinc website as it was previously and as confirmed by Mr. Villareal.

• Zinc ships all of its paper products in rolls and the size and dimensions of the rolls of paper are based upon the specifications provided to Zinc by its customers.

• The approximate weight for each roll of paper ordered and shipped from Zinc's Monterey [sic], Mexico plant is three metric tons and have always been between 2.5 and 3 metric tons.

• Specialized forklifts are used to load the paper rolls onto trailers at the Zinc plant in Monterey [sic], Mexico.

• Zinc typically exchanges with AG purchase orders, invoices and packing lists. Zinc also receives wire transfers directly from AG.

• A representative of Zinc travels to New Mexico to meet with AG every three to six months.

• Zinc built the plant in Monterey [sic], Mexico due substantially to and dependent upon the gray back paper needs of AG in New Mexico.

Not a single one of these fact-specific recitations mentions contact with the State of Texas.

*Do These Facts Demonstrate Continuous and Systematic Contact?*

The Texas Supreme Court has recognized that general jurisdiction requires a more demanding minimum contacts analysis. *Spir Star AG v. Kimich*, 310 S.W.3d 868 (Tex. 2010), 53 Tex.Sup.Ct.J. 423. Indeed, the contacts must be "substantial". *CSR, Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996). We have considerable detailed evidence about the accident at issue and Zinc's purported negligence in loading the rolls of grey back paper at its manufacturing facility in Monterrey. We know that Zinc contracted with C.H. Robinson de Mexico, a Mexican company, to truck the paper to the border. Alverde testified that the purchaser, American Gypsum, was responsible for arranging transportation from the border to its facilities in New Mexico. And Bouché Trucking, a Texas company, was employed for that purpose.

As we noted above, the Supreme Court recognized that Zinc does have three or four customers for its other products in Texas, and receives some raw materials from Texas. While irrelevant to the question of specific jurisdiction, the court opined that it might be relevant to a general jurisdiction argument. We would agree had we been presented with evidence concerning these contacts. Alverde averred in his affidavit only that Zinc's practice with both customers and suppliers is to transfer title in Mexico, and Zinc only receives a small amount of its raw materials from suppliers in Texas. We have not been advised of the identity or location of the customers, the products which are sold to those customers, the identity or location of the suppliers of raw materials, the nature of the raw materials, the type of interaction Zinc has with the Texas entities, or the

frequency of those contacts. Are these contacts sufficient? We think not.

General jurisdiction is often described as "dispute blind", an exercise of jurisdiction made without regard to the nature of the claim presented. *Moki Mac River Expeditions v. Drugg*, 270 S.W.3d 799, 802 (Tex.App.--Dallas 2008, no pet.)(on remand). Only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *Retamco*, 278 S.W.3d at 339. It is the quality and nature of the defendant's contacts with the forum state rather than their number. *Id.* All of the contacts must be carefully investigated and analyzed for proof of a pattern of continuing and systematic activity and we are to apply these factors to all of the nonresident defendant's contacts with Texas. *Schlobohn*, 784 S.W.2d at 359. Usually, the nonresident defendant must be engaged in longstanding business in the forum state, such as marketing, shipping products, performing services, or maintaining offices. *Assurances Générales Banque Nationale v. Dhalla*, 282 S.W.3d 688, 697 (Tex.App.--Dallas 2009, no pet.), *citing PHC-Minden, L.P. v Kimberly-Clark Corp.*, 235 S.W.3d 163, 168 (Tex. 2007). But placing a product into the stream of commerce with an awareness that the property may end up on Texas is insufficient to support general jurisdiction. *Spir Star AG*, 310 S.W.3d at 874.

Because the primary focus of the parties in the trial court was specific jurisdiction, the circumstances of other business relationships have not been fleshed out in the record. Who contacted whom? Merely contracting with a Texas resident does not satisfy the minimum contacts requirement. *Internet Advertising Group, Inc. v. Accudata, Inc.*, 301 S.W.3d 383, 389 (Tex.App.--Dallas 2009, no pet.), *citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The facts must indicate the Zinc intended to serve the Texas market. *Assurances Générales Banque Nationale,* 282 S.W.3d at 700. Bouché also had the burden to demonstrate that Zinc sought some benefit, advantage, or profit by availing itself of the state's

jurisdiction. *Id.* While we do not know the circumstances of these other business arrangements, we can ascertain that there has been no litigation in Texas involving these relationships. Zinc has no assets, property, or bank accounts in Texas. *Moki Mac*, 270 S.W.3d at 803.

We must thus conclude that Zinc had contacts with Texas but none sufficient to support general jurisdiction. *Id.*, *citing PHC-Minden Inc.*, 235 S.W.3d at 171. Having found no general jurisdiction, we need not consider whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. We reverse the trial court's order denying Zinc's special appearance and render judgment dismissing the case against Zinc for want of personal jurisdiction.

December 15, 2010

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.
Rivera, J., not participating