INTERNET ADVERTISING GROUP, INC., Appellant,

v.

ACCUDATA, INC., Appellee.

No. 05–09–00405–CV.

Court of Appeals of Texas, Dallas.

Nov. 18, 2009.

Rehearing Overruled Jan. 13, 2010.

G. Kevin Buchanan, Melissa J. Bellan, Buchanan & Bellan, LLP, Dallas, TX, for appellant.

Daniel G. Rogers, Ferguson Davis, P.C., Dallas, TX, for appellee.

Before Justices O'NEILL, FRANCIS, and LANG.

## OPINION

Opinion By Justice FRANCIS.

Accudata, Inc. sued Internet Advertising Group, Inc., a Florida corporation, for payment it alleged was due on a contract. The trial court denied IAG's special appearance. In this interlocutory appeal, IAG contends its contacts with the State of Texas are insufficient to support personal jurisdiction. We agree. Accordingly, we reverse the trial court's order and render judgment dismissing the claims against IAG for want of jurisdiction.

Accudata, a Delaware corporation with its principle place of business in Allen, Texas, provides telecommunication services. In 2006, Accudata contacted IAG, an internet marketing company, by telephone and made a sales pitch to obtain IAG's business. Accudata then sent sample tests of its systems and services to IAG. As a result of these discussions, IAG completed a credit application and entered into a written contract for Accudata to verify the validity of telephone numbers of potential customers. Under the contract, IAG transmitted queries electronically for verification by Accudata, who then routed the queries "through its connections to the Line Information Databases (LIDBs) in North America or other appropriate databases" and responded with the "appropriate approval code." The contract automatically renewed each year unless one of the parties gave thirty days' written notice before the expiration of any current one-year term. The contract also provided that Texas law governed the agreement.

Over the next two years, IAG transmitted hundreds of thousands of electronic record queries for validation by Accudata and sent its payments to Accudata in Texas. In 2008, IAG allegedly became delinquent on its payments. Accudata terminated the account and sued IAG in Texas for $27,772.15 in unpaid invoices.

IAG filed a special appearance, asserting it was not amenable to jurisdiction in Texas. IAG attached the affidavit of its chief executive officer, Michael Weinsoff, who averred among other things that IAG does not maintain an office, bank accounts, or employees in Texas; does not own or possess real property in Texas; does not actively advertise in Texas and has never mass-mailed solicitations to Texas residents; and does not maintain a registered agent for service of process. Further, Weinsoff stated that, to his knowledge, no IAG representative has traveled to Texas for the purpose of conducting or engaging in any business transaction or to negotiate terms of a contract with any person or entity, including Accudata.

Accudata filed a response and attached the affidavit of its president and chief executive officer, M. Gregory Smith; demand letters to IAG; the contract; an itemized account statement; selected Accudata invoices; IAG discovery responses, including IAG inter-office emails regarding a case study and testimonial. Among other things, Smith averred that IAG transmitted queries for validation by Accudata; Accudata used its facilities, equipment, and database in Texas to provide its validation services; and Accudata billed IAG, and IAG transmitted payments to Texas. After considering the record and evidence, the trial court denied the special appearance. This appeal followed.

We review de novo the trial court's decision to deny a special appearance. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002); *Capital Tech. Information Servs., Inc. v. Arias & Arias Consultores,* 270 S.W.3d 741, 747–48 (Tex.App.-Dallas 2008, pet. denied) (en banc). The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant

within the provisions of the Texas long-arm statute. *BMC Software,* 83 S.W.3d at 793; *Capital Tech.,* 270 S.W.3d at 748. The nonresident defendant has the burden of negating all bases of jurisdiction alleged in the plaintiff's petition. *BMC Software,* 83 S.W.3d at 793; *Capital Tech.,* 270 S.W.3d at 748.

Texas courts may assert *in personam* jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction comports with federal and state constitutional due process guarantees. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex.2009). The long-arm statute's broad language allows Texas courts to "reach as far as the federal constitutional requirements of due process will allow." *Id.* Thus, a Texas court may exercise personal jurisdiction over a nonresident if doing so is consistent with constitutional due process requirements. *Id.*

Under constitutional due process analysis, personal jurisdiction is achieved when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the assertion of jurisdiction complies with "traditional notions of fair play and substantial justice." *Id.* We focus on the defendant's activities and expectations when deciding whether it is proper to call the defendant before a Texas court. *Id.* at 338.

A nonresident's contacts can give rise to either specific or general jurisdiction. *Id.* at 338. Specific jurisdiction lies when the defendant's alleged liability arises from or is related to those contacts or activities. *Id.* The analysis focuses on the relationship among the defendant, the forum, and the litigation. *Id.* General jurisdiction will attach if the defendant's contacts with the forum are continuous and systematic, whether or not the defendant alleged liability arising from those contacts. *BMC Software,* 83 S.W.3d at 796.

Under either a specific or general jurisdictional analysis, the relevant contacts are those through which a defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Retamco,* 278 S.W.3d at 338. In determining purposeful availment, we consider three issues. First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person. *Retamco,* 278 S.W.3d at 339. Second, the contacts must be purposeful rather than random, fortuitous, or attenuated. *Id.* Third, the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* The purpose of a minimum contacts analysis is to protect a nonresident defendant from being haled into court when its relationship with the forum state is too attenuated to support jurisdiction. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 806 (Tex. 2002). What is important is the quality and nature of the defendant's contacts with the forum state rather than their number. *Retamco,* 278 S.W.3d at 339. Only if "minimum contacts" are established does the court consider the second prong—whether maintenance of the action offends traditional notions of fair play and substantial justice.

Accudata pleaded both specific and general jurisdiction. We begin with specific jurisdiction. As purposeful contacts, Accudata asserts IAG entered into a contract with Accudata, "primarily performable" in Texas, and containing a Texas choice of law provision; applied for credit; made payments in Texas; and participated in a

case study involving Accudata and prepared a testimonial on behalf of Accudata. IAG argues these contacts are either the unilateral acts of Accudata or are merely fortuitous.

 Merely contracting with a Texas resident does not satisfy the minimum contacts requirement. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). To evaluate purposeful availment, we look to such factors as prior negotiations, contemplated future consequences, terms of the contract and the parties' actual course of dealing to determine whether the defendant purposefully established minimum contacts with the forum. *Id.* at 479. Applying these factors to the evidence, we agree the alleged contacts do not demonstrate purposeful availment.

We begin with the observation that IAG did not reach out beyond its state's borders to solicit business with Accudata. Rather, Accudata contacted IAG in Florida to sell its services to the Florida company and then sent IAG sample tests of its systems and services. No negotiations occurred in Texas, and no IAG representative traveled to Texas, either during negotiations or after the contract was executed, to conduct any business with Accudata. The parties entered into a contract that gave either the option of terminating it by giving written notice thirty days' prior to the expiration of the current one-year term. Moreover, the agreement did not contemplate an interdependent relationship, specifically providing that neither party had control over the other with respect to "hours, times, employment, etc." and that neither would be deemed an employee of the other or act as an agent of the other. *Cf. Burger King,* 471 U.S. at 479, 105 S.Ct. 2174 (holding specific jurisdiction existed when franchisee "reached out beyond" his home state to negotiate long-term contract involving regulation by company in forum state).

Although there is evidence Accudata "utilized its facilities, equipment and database in Allen, Texas" to provide the validation services, the contract did not require performance in Texas. Indeed, the contract expressly allowed for Accudata to route IAG's queries to thirteen different databases in the United States and Canada, other than the one located in Allen, Texas. So, while IAG may have transmitted hundreds of thousands of queries over the two-year period, there is nothing to suggest that it mattered to IAG where the contract was performed or which database Accudata used to perform its work; thus, we cannot view this as a purposeful contact on IAG's part. *See Command–Aire Corp. v. Ontario Mech. Sales & Serv., Inc.,* 963 F.2d 90, 94 (5th Cir.1992) ("If ... the forum plaintiff's decision to perform the contractual obligation within its own forum state is totally unilateral, it cannot be viewed as purposeful on the part of the nonresident and the weight is necessarily diminished.")

 IAG did transmit payments to Texas, but contracting with a Texas company and requiring payments in Texas do not alone necessarily establish sufficient minimum contacts to demonstrate specific jurisdiction. *See U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 763 (Tex.1977). Moreover, the contract here did not provide for a place of payment. When a contract requires the payment of money but does not specify where the payment is to be made, the place of payment is the domicile of the payor. 256 S.W.3d at 922. This is true regardless of where the payment is finally received. *Id.* But, even if contractually obligated to make payments to the forum state, such an agreement would not weigh heavily in the "calculus of contacts." *See Stuart v. Spademan,* 772

F.2d 1185, 1194 (5th Cir.1985). Accordingly, under any circumstance, IAG's transmittal of payments to Accudata in Texas can hardly be termed significant in terms of determining purposeful availment of the benefits of the forum state's laws.

As for IAG's credit application and agreement to participate in a case study and to provide a testimonial, we cannot assign the significance to these that Accudata suggests. This Court considered credit as a factor in a specific jurisdictional analysis in *North Coast Commercial Roofing Sys., Inc. v. RMAX, Inc.,* 130 S.W.3d 491 (Tex.App.-Dallas 2004, no pet.). There, an Ohio company purchased roof deck from a Texas company on a credit account that it established with the Texas company sixteen years earlier. The Ohio company specifically solicited the credit account so it could distribute the Texas company's products. *Id.* at 493. This Court concluded that solicitation of the goods on credit, combined with the fact the nonresident defendant executed a contract with a Texas resident that contained a choice of law provision and required payment in Texas, established purposeful availment. *Id.* at 495.

Here, as stated previously, Accudata solicited the business relationship with IAG. Moreover, the account was not an open account for the distribution of Accudata's products or services. Indeed, the terms of the credit application required that all bills were to be paid "in full" on the fifteenth day following the invoice date, and if not paid within twenty-one days, were considered past due and subject to a two percent service charge. Consequently, it is difficult to construe this as credit in the traditional sense. As for the case study and testimonial, the evidence indicates these were solicited by Accudata and that Accudata provided the "sample" testimonial.

■ That leaves us with the contractual choice of law provision. A choice of law provision warrants some weight in considering whether a defendant has purposefully invoked the benefits and protection of a state's law for jurisdictional purposes; however, such a provision standing alone is not sufficient to confer jurisdiction. *Burger King,* 471 U.S. at 482, 105 S.Ct. 2174; *Preussag Aktiengesellschaft v. Coleman,* 16 S.W.3d 110, 125 (Tex.App.-Houston [1st Dist.] 2000, pet. dism'd w.o.j.). "Nor does it indicate a voluntary submission to the personal jurisdiction of the state's courts in the absence of any express understanding to that effect." *Aktiengesellschaft,* 16 S.W.3d at 125. Although IAG agreed Texas law would govern the contract, it did not agree that any dispute arising under the contract would be litigated in Texas nor was there any other evidence to that effect. To the contrary, Weinsoff testified that IAG, as a matter of business practice, does not enter into contracts with forum selection clauses.

Giving the choice of law provision its due weight, and considering the totality of the facts of the case and the quality (or lack thereof) and nature of the remaining alleged contacts, particularly as they relate to negotiations, contemplated future consequences, contract terms, and actual course of dealing, we conclude the evidence fails to show that IAG had sufficient minimum contacts to support the exercise of specific jurisdiction. *See U–Anchor Adver.,* 553 S.W.2d at 763 (concluding Texas court did not have personal jurisdiction over Oklahoma resident where contract was solicited, negotiated, and consummated in Oklahoma, was partially performable in Texas, and obligated out-of-state defendant to make payments to Texas); *Stuart,* 772 F.2d at 1192–94 (concluding Texas court did not have personal jurisdiction over Nevada resident who contracted with Texas resident, shipped goods into Texas

for modification, sent letters and made telephone calls to plaintiffs in Texas, received communications from plaintiffs, agreed to a choice-of-law provision selecting Texas law, and mailed payments to Texas).

▇▇▇▇ Having concluded specific jurisdiction does not lie, we next address whether general jurisdiction has attached. A general jurisdiction inquiry is different from a specific jurisdiction inquiry and involves a "more demanding minimum contacts analysis" with a "substantially higher" threshold. *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, 235 S.W.3d 163, 168 (Tex.2007). Usually, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." *Id.* General jurisdiction is considered to be "dispute blind" as it permits the court to exercise jurisdiction over the nonresident defendant on any claim, including claims unrelated to the defendant's contacts with the state. *Id.* Accordingly, the incident made the basis of the suit should not be the focus in assessing continuous and systematic contacts—contacts on which jurisdiction over any claim may be based. *Id.*

The evidence established that IAG was a Florida corporation with its principal place of business in Florida and had never had an an office anywhere else; it had no officers, directors, or employees residing in Texas; it was not licensed or regulated by Texas authorities; it had never actively advertised in Texas and had never mass-mailed solicitations to Texas residents; it did not maintain an agent for service of process; it did not own or possess real property in Texas; it had never manufactured, packaged, sold, or distributed products in Texas; it did not maintain a bank account in Texas and had never filed suit in Texas; it had not traveled to Texas for the purpose of conducting or engaging in any business transaction or to negotiate the terms or conditions of or entering into a contract or agreement with any person or entity; and it had never agreed to the exercise of personal jurisdiction by a court in Texas.

For general jurisdiction, Accudata relied on evidence provided in discovery that IAG had thirteen Texas customers and eleven vendors in Texas. Accudata alleged that IAG's contacts with it, coupled with these other business relationships, supported general jurisdiction. IAG presented evidence regarding the other business relationships. David Davisson, chief financial officer of IAG, testified by affidavit that IAG has contractual relationships with 355 customers of which thirteen, or 3 percent, reside in Texas, and 514 vendors of which eleven, or two percent, reside in Texas. Davisson also testified that less than one percent of IAG's revenues was derived from Texas residents in 2008. Specifically, of IAG's thirteen Texas customers, seven produced no revenue and four produced less than $1000.

The question we must decide is whether this evidence shows a "fairly substantial" level of continuous and systematic contacts for general jurisdiction. *See PHC–Minden*, 235 S.W.3d at 167, 169. In connection with our inquiry, we consider the Supreme Court's analysis in two personal jurisdiction cases.

In *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), the president of a Philippine mining corporation maintained an office in Ohio during World War II, where he conducted personal and corporate affairs, kept office files, carried on business correspondence, distributed salary checks,

maintained bank accounts for company funds, held several directors' meetings, and "supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines." *Id.* at 447–48. The Supreme Court determined the president "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." *Id.* at 448.

In *Helicopteros Nacionales de Colombia, S.A., v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), the Supreme Court considered the contacts with the forum state of a Colombian corporation that was in the business of supplying helicopters for oil and construction companies in South America. Helicol sent its chief executive officer to Houston for a contract negotiation session; accepted into its New York bank account more than $5 million in payments drawn on a Houston bank; bought helicopters, equipment, and training services from Bell Helicopter in Texas for "substantial sums"; and sent personnel to Bell's facilities in Texas for training. *Id.* The Supreme Court analyzed these contacts "to determine whether they constitute the kind of continuous and systematic general business contacts the Court found to exist in *Perkins.*" *Id.* The Court concluded they were not. *Id.* at 416–19, 104 S.Ct. 1868. The Court stated that beyond these contacts, there had been no other business contacts between Helicol and the State of Texas:

> Helicol never has been authorized to do business in Texas and never has had an agent for the service of process within the State. It never has performed helicopter operations in Texas or sold any product that reached Texas, never solicited business in Texas, never signed any contract in Texas, never had any employee based there, and never recruited an employee in Texas. In addition, Helicol never has owned real or personal property in Texas and never has maintained an office or establishment there. Helicol has maintained no records in Texas and has no shareholders in that State.

*Id.* at 411, 104 S.Ct. 1868.

■ Considering the evidence of IAG's contacts under the analysis of *Perkins* and *Helicopteros Nacionales,* we conclude it does not support the exercise of general jurisdiction. Given that purchases from Texas vendors do not establish general jurisdiction, *see Am. Type Culture Collection,* 83 S.W.3d at 808, we fail to see the relevancy of the twelve Texas vendors to our analysis. Additionally, evidence that IAG had thirteen customers here from which it derived less than one percent of its revenues is simply not sufficient to establish "continuous and systematic" contacts, even when considering the vendors and the contacts with Accudata.

In its brief, Accudata asks this Court to remand to allow more discovery on the general jurisdiction issue. The parties engaged in jurisdictional discovery prior to the trial court determining the special appearance question, and Accudata had the opportunity to obtain any relevant information. Accudata did not complain to the trial court that it needed more time to obtain discovery nor did it ask for more time. Consequently, we decline Accudata's belated request to remand to the trial court so that additional discovery can be done.

Because the record does not demonstrate that IAG had sufficient minimum contacts to support the exercise of general or specific jurisdiction over IAG, we conclude the trial court erred in denying the special appearance. We need not decide any argument regarding whether the exercise of jurisdiction over IAG comports with the traditional notions of fair play and

substantial justice. We sustain the sole issue.

We reverse the trial court's order and render judgment dismissing the claims against IAG.