

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00104-CV
_____

NWR GEORGIA CONSTRUCTION, LLC, Appellant

V.

MASTER WOODCRAFT CABINETRY, LLC, AND MCW INDUSTRIES, LLC, Appellees

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 21-0302

Before Morriss, C.J., Stevens and Carter,* JJ.
Opinion by Chief Justice Morriss

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# OPINION

In this interlocutory appeal from the trial court's order overruling NWR Georgia Construction, LLC's (NWR), special appearance[1] in a lawsuit filed against it by Master Woodcraft Cabinetry, LLC (MWC), and MCW Industries, LLC (MCW Industries), the principal issues are whether NWR consented to personal jurisdiction in Texas and whether NWR was subject to specific jurisdiction in Texas. Because we conclude that (1) NWR did not consent to being sued in Texas and (2) NWR was not subject to specific jurisdiction in Texas, we reverse the trial court's order and remand for further proceedings.

## I.       Factual and Procedural Background

NWR, a Georgia limited liability company with its principal place of business in Charlotte, North Carolina, was the general contractor for a multifamily project in Decatur, Georgia, known as Scott Crossing. In late 2019 and early 2020, NWR subcontracted with MWC to build cabinets for the Scott Crossing project and subcontracted with MCW Industries to install the cabinets constructed by MWC.[2] In connection with the subcontracts, Rozanna Lewane, vice president of credit for MWC, asked Casey White, vice president of construction for NWR, to sign a credit application containing a forum-selection clause identifying Harrison County, Texas, as the forum for resolution of any disputes. The credit application included a paragraph entitled "Agreement," followed by a signature line, and a separate paragraph entitled "Guaranty,"

---

[1]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(7) (Supp.).

[2]The subcontract between NWR and MWC was labeled SC-030 while the subcontract between NWR and MCW Industries was labeled SC-046 (collectively referred to as "the subcontracts").

2

followed by a separate signature line. The agreement section of the credit application stated, in pertinent part:

> In consideration of the extension of credit to the Purchaser by MWCC/MCW Ind., if credit is extended, Purchaser agrees that this transaction is consummated in Harrison County, Texas[,] and agrees that jurisdiction and venue for any suit arising out of any relationship between Purchaser and MWCC/MCW Ind. under any theory of law or any cause of action shall be only in the appropriate County or State Court in Harrison County, Texas[,] and Purchaser expressly agrees and consents to jurisdiction and venue in said State and County. In further consideration of the extension of credit by Seller to Purchaser, the Purchaser expressly agrees that no removal to any United States District Court or transfer of venue (Federal or State) shall ever be sought by Purchaser and Purchaser hereby waives any objection to in personam jurisdiction and venue and agrees to make no request to transfer any suit to any other Court, other than the appropriate County or State Court in Harrison County, Texas. MWCC/MCW Ind. will not, under any circumstances, participate in arbitration.

When he received the credit application, White emailed Lewane, stating:

> Please find attached as requested. More than a credit application, this seems to look to define legal terms that contradict the project and subcontract information. Also there is no personal guarantee here but I have also attached the project funding letter from PNC Bank.

> If signature is required on [an] application without such info please let me know and I can provide; otherwise I have signed our credit resume for your review and reference.

> Let me know if you have any questions or require anything further at this time to complete these subcontracts, thanks.

The credit application was included in the email from White to Lewane, but White had marked a red line through the guaranty portion of the application and had not signed the agreement portion of the application, instead writing: "N/A – All payment terms per issued subcontracts SC-030 & SC-046," as reflected below in the document returned to Lewane:

3

| BANK REFERENCE | | | |
|---|---|---|---|
| Bank Name | Address | Contact | Telephone |
| See Attachment | | | |

**AGREEMENT:**

The term "Purchaser" as used in the AGREEMENT and below GUARANTY shall be deemed to include all parent(s), subsidiaries, partners, joint ventures, co-ventures, affiliates, successors, assigns and related entities to the entity requesting credit. If Purchaser desires the extension of credit by Seller, it is agreed that in consideration of the extension of credit by Master WoodCraft Cabinetry, LLC/MCW Industries, LLC (MWCC/MCW Ind.), they may impose interest or late charges in the maximum amount permitted by Texas law on any past due balances. If suit is filed by Seller to collect any amount(s) due, Purchaser agrees to pay Seller all costs of suit and collection including but not limited to reasonable attorney's fees, expenses of investigation and discovery, and court costs. All amounts due by Seller are 'net 30 days from the date of invoice' and are due and payable at 232 North Marshall Industrial Avenue, Marshall, Texas 75670, Harrison County, Texas. If terms are not met, MWCC/MCW Ind. is granted the right to withhold shipments without further notice. The relationship between Seller and Purchaser and all suits between MWCC/MCW Ind. and Purchaser arising under any theory of law or any cause of action shall be governed under the laws of the State of Texas without regard to any conflict of laws provision. In consideration of the extension of credit to the Purchaser by MWCC/MCW Ind., if credit is extended, Purchaser agrees that this transaction is consummated in Harrison County, Texas and agrees that jurisdiction and venue for any suit arising out of any relationship between Purchaser and MWCC/MCW Ind. under any theory of law or any cause of action shall be only in the appropriate County or State Court in Harrison County, Texas and Purchaser expressly agrees and consents to jurisdiction and venue in said State and County. In further consideration of the extension of credit by Seller to Purchaser, the Purchaser expressly agrees that no removal to any United States District Court or transfer of venue (Federal or State) shall ever be sought by Purchaser and Purchaser hereby waives any objection to in personam jurisdiction and venue and agrees to make no request to transfer any suit to any other Court, other than the appropriate County or State Court in Harrison County, Texas. MWCC/MCW Ind. will not, under any circumstances, participate in arbitration. The undersigned certifies that the above furnished information is true and correct and acknowledges that this AGREEMENT shall supersede all prior agreements and become a part of the terms of all future agreements, including but not limited to any and all sales contracts, purchase orders, change orders, and/or subcontracts between MWCC/MCW Ind. and Purchaser. The terms of this AGREEMENT can only be changed and/or waived by a written consent that specifically references this AGREEMENT and signed by the COO, CEO and/or CFO of MWCC/MCW Ind. In the event of an inconsistency between the terms and provisions of this AGREEMENT and the terms and provisions of any other agreements, the terms and provisions of this AGREEMENT shall take precedence.

N/A - All payment terms per issued subcontracts SC-030 & SC-046     12/19/2019

| Signature | Title | Date |
|---|---|---|

**GUARANTY:**     N/A          Casey White - Vice President - 704-968-6361

In consideration of the extension of credit to the Purchaser above by Master WoodCraft Cabinetry, LLC/MCW Industries, LLC (MWCC/MCW Ind.), the undersigned hereby consents and agrees to all the provisions set forth in the above foregoing AGREEMENT and agrees that the provisions are incorporated in the GUARANTY by reference and shall apply to the person or persons executing the GUARANTY, and personally guarantees payments of all invoice amounts and other amounts due or to become due to MWCC/MCW Ind., including reasonable attorney's fees, expenses of investigation and discovery and court costs arising from purchases or any other relationship between Purchaser and MWCC/MCW Ind. The undersigned waives notice of acceptance of the guaranty and notice of any default and demand of every kind, nature and description as well as notice of any default and demand of every obligation and liability of such Purchaser or the undersigned. This guaranty shall be a continuing guaranty and shall not be diminished or affected by an extension of time, payment, modification, change order or additions to any contract between MWCC/MCW Ind. and the Purchaser, and shall apply to all future orders or contracts of Purchaser with MWCC/MCW Ind. This guaranty can only be cancelled/terminated by a written consent signed by COO, CEO and/or CFO of MWCC/MCW Ind. The relationship between Guarantor and MWCC/MCW Ind. shall be governed and interpreted as set forth in the above AGREEMENT pertaining to jurisdiction, venue and choice of law without regard to any conflict of law provision. In consideration of the extension of credit to Purchaser by MWCC/MCW Ind., if credit is extended, Guarantor expressly agrees to all the terms and conditions regarding suits between Purchaser and Seller as set forth in the above AGREEMENT.

| Signature | Date |
|---|---|

Lewane emailed White following receipt of this document, "THANKS -- CAN YOU SIGN THE AGREEMENT PORTION," to which White responded, "Sure thing, Please find attached." This time, White had signed the agreement portion of the credit application, but had marked through it with a red line as follows:

4

| BANK REFERENCE | | | |
|---|---|---|---|
| Bank Name | Address | Contact | Telephone |
| See Attachment | | | |

**AGREEMENT:** N/A - All payment terms per issued subcontracts SC-030 & SC-046

The term "Purchaser" as used in the AGREEMENT and below GUARANTY shall be deemed to include all parent(s), subsidiaries, partners, joint ventures, co-ventures, affiliates, successors, assigns and related entities to the entity requesting credit. If Purchaser desires the extension of credit by Seller, it is agreed that in consideration of the extension of credit by Master WoodCraft Cabinetry, LLC/MCW Industries, LLC (MWCC/MCW Ind.), they may impose interest or late charges in the maximum amount permitted by Texas law on any past due balances. If suit is filed by Seller to collect any amount(s) due, Purchaser agrees to pay Seller all costs of suit and collection including but not limited to reasonable attorney's fees, expenses of investigation and discovery, and court costs. All amounts due by Seller are 'net 30 days from the date of invoice' and are due and payable at 232 North Marshall Industrial Avenue, Marshall, Texas 75670, Harrison County, Texas. If terms are not met, MWCC/MCW Ind. is granted the right to withhold shipments without further notice. The relationship between Seller and Purchaser and all suits between MWCC/MCW Ind. and Purchaser arising under any theory of law or any cause of action shall be governed under the laws of the State of Texas without regard to any conflict of laws provision. In consideration of the extension of credit to the Purchaser by MWCC/MCW Ind., if credit is extended, Purchaser agrees that this transaction is consummated in Harrison County, Texas and agrees that jurisdiction and venue for any suit arising out of any relationship between Purchaser and MWCC/MCW Ind. under any theory of law or any cause of action shall be only in the appropriate County or State Court in Harrison County, Texas and Purchaser expressly agrees and consents to jurisdiction and venue in said State and County. In further consideration of the extension of credit by Seller to Purchaser, the Purchaser expressly agrees that no removal to any United States District Court or transfer of venue (Federal or State) shall ever be sought by Purchaser and Purchaser hereby waives any objection to in personam jurisdiction and venue and agrees to make no request to transfer any suit to any other Court, other than the appropriate County or State Court in Harrison County, Texas. MWCC/MCW Ind. will not, under any circumstances, participate in arbitration. The undersigned certifies that the above furnished information is true and correct and acknowledges that this AGREEMENT shall supersede all prior agreements and become a part of the terms of all future agreements, including but not limited to any and all sales contracts, purchase orders, change orders, and/or subcontracts between MWCC/MCW Ind. and Purchaser. The terms of this AGREEMENT can only be changed and/or waived by a written consent that specifically references this AGREEMENT and signed by the COO, CEO and/or CFO of MWCC/MCW Ind. In the event of an inconsistency between the terms and provisions of this AGREEMENT and the terms and provisions of any other agreements, the terms and provisions of this AGREEMENT shall take precedence.

Casey White   Vice President          12/19/2019

Signature          Title          Date

**GUARANTY:**

In consideration of the extension of credit to the Purchaser above by Master WoodCraft Cabinetry, LLC/MCW Industries, LLC (MWCC/MCW Ind.), the undersigned hereby consents and agrees to all the provisions set forth in the above foregoing AGREEMENT and agrees that the provisions are incorporated in the GUARANTY by reference and shall apply to the person or persons executing the GUARANTY, and personally guarantees payments of all invoice amounts and other amounts due or to become due to MWCC/MCW Ind., expenses of investigation and discovery and court costs arising from purchases or any other relationship between Purchaser and MWCC/MCW Ind. The undersigned waives notice of acceptance of the guaranty and notice of any default and demand of every kind, nature and description as well as notice of any default and demand of every obligation and liability of such Purchaser or the undersigned. This guaranty shall be a continuing guaranty and shall not be diminished or affected by an extension of time, payment, modification, change order or additions to any contract between MWCC/MCW Ind. and the Purchaser, and shall apply to all future orders or contracts of Purchaser with MWCC/MCW Ind. This guaranty can only be cancelled/terminated by a written consent signed by COO, CEO and/or CFO of MWCC/MCW Ind. The relationship between Guarantor and MWCC/MCW Ind. shall be governed and interpreted as set forth in the above AGREEMENT pertaining to jurisdiction, venue and choice of law without regard to any conflict of law provision. In consideration of the extension of credit to Purchaser by MWCC/MCW Ind., if credit is extended, Grantor expressly agrees to all the terms and conditions regarding suits between Purchaser and Seller as set forth in the above AGREEMENT.

Not Applicable - See Attachments

Signature          Date

As indicated, White had written in red lettering that the agreement portion was "N/A" and that "[a]ll payment terms [were] per issued subcontracts SC-030 & SC-046." White also emailed Lewane, along with the credit application shown above, its credit resume and a letter from PNC Real Estate indicating that "the loan in the name of NR Decatur Crossing Property Owner II LLC for the 'Scott Crossing' project [had] been closed and [was] expected available to be drawn on."

After the subcontracts[3] were executed, the parties executed addendums to the subcontracts. The addendum to subcontract SC-030 stated, in paragraph two, "Master Woodcraft Cabinetry, LLC's credit application, and approved shop drawings and approved samples are AN integral part of this agreement and take precedence over plans, specs, and all other contract documents." Paragraph fourteen of the addendum stated:

> The terms noted in this Addendum are binding upon both parties contrary to any other terms expressed in the foregoing Purchase Order/Subcontract. In the event of a conflict between contract documents, this Addendum shall govern. This Addendum becomes effective and binding upon release of first order to manufacturing.

The addendum to subcontract SC-030 was signed by White and Lewane on January 15, 2020, on behalf of NWR and MWC, respectively. The addendum to subcontract SC-046 stated, in paragraph two, "MCW Industries, LLC's Credit application become [sic] an integral part of this agreement." Paragraph thirteen of that addendum stated, "This Addendum becomes effective and binding upon commencement of work." The addendum to subcontract SC-046 was signed by White and Lewane on January 15, 2020, on behalf of NWR and MCW Industries, respectively.

In March 2021, MWC and MCW Industries filed suit against NWR, alleging, in their first amended petition, that NWR failed to pay in accordance with the subcontracts. MWC and MCW Industries sought a declaratory judgment that NWR owed MWC $79,725.78 and owed MCW Industries $53,061.18 and further stated a claim for quantum meruit. NWR filed a verified special appearance, claiming that the trial court did not have general or specific personal

---

[3]The subcontracts included in the appellate record were signed by MWC and MCW Industries on January 15, 2020, but lack NWR's signature. Neither party disputes that they entered into legally binding subcontracts.

6

jurisdiction and that the forum-selection clause in the credit application could not be invoked to support jurisdiction because the clause was unambiguously stricken from the credit agreement.[4]

In response, MWC and MCW Industries claimed that NWR agreed to the forum-selection clause in the credit application, claiming that White only objected to it because "all *payment terms* [were] per issued subcontracts SC-030 & SC-046" and that he did not "expressly state that any other term was not applicable." They further argued that the forum-selection clause was enforceable because, after the credit application was signed, NWR agreed to incorporate the credit application into each of the subcontracts. Alternatively, MWC and MCW Industries argued that Texas had specific jurisdiction over NWR.[5]

---

[4]NWR attached the following documents to its verified special appearance:

- The unsworn declaration of its vice president and general counsel, Michael Wilson;
- The unsworn declaration of Casey White;
- A signed copy of the credit application showing both the agreement and guaranty paragraphs marked through;
- NWR's credit resume submitted to MWC and MCW Industries;
- PNC Real Estate's letter indicating that the loan for the Scott Crossing project had been closed; and
- The e-mail chain between White and Lewane regarding the credit application.

[5]MWC and MCW Industries attached the following documents to its verified response to NWR's special appearance:

- The declaration of John Cathey, the executive vice president and chief financial officer of both MWC and MCW Industries;
- A blank credit application;
- The e-mail chain between White and Lewane regarding the credit application;
- The initial credit application with the guaranty paragraph marked through;
- NWR's credit resume submitted to MWC and MCW Industries;
- PNC Real Estate's letter indicating that the loan for the Scott Crossing project had been closed;
- The final version of the credit application signed by White, with both the agreement and guaranty paragraphs marked through;
- Subcontracts SC-030 and SC-046;
- The addendum to subcontract SC-046; and
- The addendum to subcontract SC-030.

Following a hearing, the trial court issued its order denying NWR's verified special appearance.

## II.    Standard of Review

"On appeal, we review *de novo* the trial court's determination to grant or deny a special appearance." *Hitachi Shin Din Cable, Ltd. v. Cain*, 106 S.W.3d 776, 781 (Tex. App.—Texarkana 2003, no pet.). "Whether a trial court has personal jurisdiction over a nonresident defendant is a question of law that we review de novo." *Wilco Farmers v. Carter*, 558 S.W.3d 197, 201 (Tex. App.—Texarkana 2018, no pet.) (quoting *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018) (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013))). "In a de novo review, the reviewing court conducts a review of the record to make its own legal determinations and conclusions." *Nissan N. Am., Inc. v. Tex. Dep't of Motor Vehicles*, 592 S.W.3d 480, 486 (Tex. App.—Texarkana 2019, no pet.) (citing *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998)). "When no findings of fact and conclusions of law are made by the trial court, 'we infer "all facts necessary to support the judgment and supported by the evidence."'" *Wilco Farmers*, 558 S.W.3d at 201–02 (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007) (quoting *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002))).

"Texas courts may assert in personam jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees." *Schexnider v. E-Cig Cent., LLC*, No. 06-20-00003-CV, 2020 WL 6929872, at *4 (Tex. App.—Texarkana Nov. 25,

2020, no pet.) (mem. op.) (quoting *Moki Mac*, 221 S.W.3d at 574 (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 356 (Tex. 1990))).  "The Texas 'long-arm statute describes what, "[i]n addition to other acts," may constitute doing business in this state.'"  *Id.* (quoting *Moki Mac*, 221 S.W.3d at 574).  "[T]he long-arm statute's broad doing-business language allows the statute to 'reach as far as the federal constitutional requirements of due process will allow.'"  *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007) (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991)).

However, when "a party contractually consents to jurisdiction in a particular forum, then the due-process and minimum-contacts analysis is unnecessary."  *Guam Indus. Servs., Inc. v. Dresser-Rand Co.*, 514 S.W.3d 828, 833 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014) ("[A] contractual 'consent-to-jurisdiction clause' subjects a party to personal jurisdiction, making an analysis of that party's contacts with the forum for personal jurisdiction purposes unnecessary.")).  "We review a trial court's decision whether to enforce a forum-selection clause for an abuse of discretion, except when our review involves contractual interpretation of the forum-selection clause, for which we employ a de novo standard of review."  *Id.*

As a result, we must initially determine whether NWR consented to jurisdiction in Texas. In the absence of such consent, we then determine whether NWR was subject to specific jurisdiction in Texas.

## III. Analysis

### A. NWR Did Not Consent to Personal Jurisdiction in Texas

MWC and MCW Industries contend that NWR consented to personal jurisdiction via the forum-selection clause included in the credit application. "Forum-selection clauses are contractual arrangements whereby parties agree in advance to submit their disputes for resolution within a particular jurisdiction." *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 700 (Tex. App.—Dallas 2010, no pet.) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985); *Phoenix Network Techs. (Eur.) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 611 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("A forum-selection clause is a creature of contract.")).

"Contractual forum-selection clauses are generally enforceable in Texas." *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding) (citing *In re AIU Ins. Co.*, 148 S.W.3d 109, 112 (Tex. 2004) (orig. proceeding)). "Forum-selection clauses are typically considered material and therefore require express assent to become binding." *Long Island Pipe, Inc. v. QT Trading, LP*, No. 01-18-00012-CV, 2018 WL 3353015, at *6 (Tex. App.—Houston [1st Dist.] July 10, 2018, no pet.) (mem. op.) (quoting *J.D. Fields, Inc. v. Indep. Enters., Inc.*, No. 4:12-CV-2605, 2012 WL 5818229, at *7 (S.D. Tex. Nov. 13, 2012)). We therefore examine the evidence to determine whether the parties expressly assented to the forum-selection clause, thus making it part of the subcontracts agreed to by the parties.

We determine whether the parties agreed to the forum-selection clause by using ordinary principles of contract interpretation. *Siegmund*, 309 S.W.3d at 700. As outlined above, the evidence reflects that Lewane, on behalf of MWC and MCW Industries, asked White, on behalf

of NWR, to sign a credit application that provided that the "transaction [was] consummated in Harrison County," that "jurisdiction and venue for any suit arising out of any relationship" between NWR and MWC/MCW Industries "shall be only in the appropriate County or State Court in Harrison County, Texas," and that NWR "expressly agree[d] and consent[ed] to jurisdiction and venue in said State and County." Rather than signing the application, White responded that the document submitted to NWR was "[m]ore than a credit application" and that it "define[d] legal terms that contradict[ed] the project and subcontract information." White then asked Lewane to let him know whether "signature [was] required on the application without such info." White then stated, "[O]therwise, I have signed our credit resume."

A long-standing rule of Texas common law is that "an acceptance is effective only if it matches the material terms of the offer to which it responds." *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 512 (Tex. 2014) (citing *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968)). If an attempted acceptance changes or qualifies a material term from the offer, the attempt operates as a rejection and counteroffer. *Id.* at 514. As applicable here, the evidence shows that MWC and MCW Industries extended an offer to NWR to enter into an agreement regarding forum, as included in the credit application. NWR rejected the offer to sign the credit application as presented and thereby did not expressly agree to the forum-selection clause within the application. That rejection operated as a counteroffer because White agreed either to sign the application "without such information" or to rely solely on its

11

signed credit resume.[6]  Lewane responded by asking White to sign the "agreement portion" of the application, which included the forum-selection clause.  White did so, but only after marking through the entire "agreement portion" of the application and only after noting at the top of the document that it was "N/A - All payment terms per issued subcontracts SC-030 & SC-046."  Although MWC and MCW Industries contend that, by this language, White only disagreed with the payment terms rather than with the entirety of the "agreement" section of the credit application, White also struck the entire agreement portion of the credit application before signing it, as indicated above.  This amounted to a rejection of the "agreement" portion of the application, including the forum-selection clause contained within the agreement.  *See G.D. Holdings, Inc. v. H.D.H. Land & Timber, L.P.*, 407 S.W.3d 856, 861 (Tex. App.—Tyler 2013, no pet.) (finding that parties did not have meeting of minds on essential contract term when term pertaining to earnest money was struck).  Nevertheless, the parties entered into the subcontracts in the absence of NWR's express assent to the terms of the credit application.[7]

Despite this fact, MWC and MCW Industries contend that the credit application became a valid and binding part of each subcontract based on the language of each addendum—as recited above—which purported to incorporate the credit agreement.  To the extent that MWC and MCW Industries contend that the original, pre-negotiated, unmarked credit application was

---

[6]In his unsworn declaration, White explained that "NWR was not willing to agree to Plaintiffs' terms on their credit application and would only sign the application 'without such info.'"  White further explained that, after Lewane asked that he sign the agreement portion, he "marked out the terms and conditions in red as set forth on Exhibit 2-1 and sent the same to Ms. Lewane."

[7]Whether NWR's actions are interpreted as a counteroffer or an outright rejection of the terms of the credit agreement—given the fact that it expressly struck through the language of the agreement—the result is the same: the absence of NWR's express assent to the credit agreement.  *See Long Island Pipe, Inc.*, 2018 WL 3353015, at *6.

incorporated into the subcontracts, we reject this argument as our sister court rejected a similar argument in *Long Island Pipe*, 2018 WL 3353015, at *1.

In that case, Long Island Pipe placed an order for pipe with Merfish Trading. After the order was placed, Merfish informed Long Island that it was first required to sign a credit application, certain terms and conditions, and a personal guarantee contained within a "New Account Document Packet." *Id.* at *2. The terms and conditions portion of the packet included a forum-selection clause. *Id.* Merfish then indicated that it only needed the signed credit application, but the signature line was located at the bottom of the terms and conditions of sale, indicating that the credit application and the terms and conditions constituted a single document. *Id.* In response, Long Island sent Merfish its company credit application and trade references. *Id.* Merfish responded that it still required a credit application from Long Island. *Id.* When Long Island did not provide the signed credit application, Merfish again requested the signed application. *Id.* at *3. Long Island responded stating that its order should be canceled if the signed credit application was required. *Id.* Following a telephone discussion, Long Island sent Merfish a completed, but unsigned, credit application. Merfish then supplied the requested pipe and invoiced Long Island for each shipment. Each invoice included the statement, "Our general terms & conditions apply to this transaction." *Id.* at *3–4. When Long Island did not pay in full, Merfish filed suit. *Id.* Merfish asserted that the trial court had personal jurisdiction over Long Island because the invoices incorporated Merfish's standard terms and conditions, including the forum-selection clause. *Id.*

13

Long Island filed a special appearance, stating that the forum-selection clause was part of the terms and conditions of the credit application, which it had expressly rejected. *Id.* Applying provisions of the Texas Business and Commerce Code, the court concluded that Long Island offered to buy the pipe on the express condition that it did not have to sign the credit application. By shipping the pipe without receiving a signed credit application, the court concluded that Merfish accepted Long Island's counteroffer. *Id.* at *6. The court further concluded that, because forum-selection clauses are material and require express assent to become binding, the language on the invoices submitted by Merfish did not incorporate the forum-selection clause into the contract. *Id.*

Even though this case is different than *Long Island Pipe* in that NWR signed the subcontract addendums, which purported to incorporate the credit application, NWR never assented to the terms of the credit application and, in fact, had expressly rejected it. MWC and MCW Industries' contention that, by signing the addendums, NWR revived the original, unmarked, pre-negotiated credit application, including the forum-selection clause, ignores the realities of the parties' negotiations regarding the credit application and NWR's repeated refusal to agree to it. NWR's repeated rejection of the terms of the credit application containing the forum-selection clause indicates that NWR never intended the forum-selection clause to become part of the subcontracts.

Assuming, without deciding, that the language in the addendums was sufficient to incorporate the credit application into the subcontracts, we conclude that only the final, negotiated credit agreement marked through by White was so incorporated. This was not a futile

14

act, as the negotiated credit application provided MWC and MCW Industries with information to determine NWR's credit worthiness.[8]

Because NWR did not assent to the forum-selection clause in the credit application and because the original agreement portion of the credit application was not incorporated into the subcontracts via the addendums, we conclude that NWR did not consent to personal jurisdiction in Texas.

**B.      NWR Was not Subject to Specific Jurisdiction in Texas**

MWC and MCW Industries' First Amended Original Petition includes the following jurisdictional allegations:[9]

> Defendant, NWR Georgia Construction, LLC ("Shaw"), engages or has engaged in business in this state, but does not maintain a regular place of business or a designated agent for service of process. This lawsuit arises out of business done in this state and to which said Defendant is a party. Therefore, under Section 17.044 of the Texas Civil Practice and Remedies Code,[10] substituted service on Defendant should be made by serving the Secretary of State of Texas . . . .
>
> . . . .

---

[8]The first page of the credit application indicated that trade references and banking references were attached. The evidence indicates that the actual documents attached to the credit application included NWR's credit resume as well as a letter from PNC Real Estate Banking confirming that the loan for the Scott Crossing Project had closed and was available to be drawn on.

[9]We recite only those allegations that do not rely on the forum-selection clause in the credit application.

[10]Section 17.044(b) the Texas Civil Practice and Remedies Code states:

> The secretary of state is an agent for service of process on a nonresident who engages in business in this state, but does not maintain a regular place of business in this state or a designated agent for service of process, in any proceeding that arises out of the business done in this state and to which the nonresident is a party.

TEX. CIV. PRAC. & REM. CODE ANN. § 17.044(b).

. . . . Venue in Harrison County is proper in this cause because the parties have agreed in writing that venue is proper here and only here, or, in the alternative, all or a substantial part of the events giving rise to the claim occurred in Harrison County.[11]

. . . .

. . . . The Defendant applied for credit in Harrison County, Texas[,] and the Plaintiffs agreed to extend credit to the Defendant. . . . The Defendant entered into contracts with MWCC to buy cabinets on credit and with MCW for cabinet installation . . . .

"A nonresident defendant's forum-state contacts may give rise to two types of personal jurisdiction." *Moki Mac*, 221 S.W.3d at 575 (citing *BMC Software*, 83 S.W.3d at 795–96). "If the defendant has made continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability arises from those contacts." *Id.* (citing *BMC Software*, 83 S.W.3d at 796).

Conversely, "specific jurisdiction 'may be asserted when the defendant's forum contacts are isolated or sporadic, but the plaintiff's cause of action arises out of those contacts with the state.'" *Spir Star AG v. Kmich*, 310 S.W.3d 868, 873 (Tex. 2010) (quoting 4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1067.5 (3d ed. 2002)). "In such cases, 'we focus on the "relationship among the defendant, the forum[,] and the litigation."'" *Id.* (alteration in original) (quoting *Moki Mac*, 221 S.W.3d at 575–76). "Specific jurisdiction is appropriate when (1) the defendant's contacts with the forum state are purposeful, and (2) the cause of action arises from or relates to the defendant's contacts." *Id.* (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009)). "For a

---

[11]Although we read these venue allegations broadly, MWC and MCW Industries do not allege, nor have they ever alleged, that NWR is subject to general jurisdiction in Texas.

Texas forum to properly exercise specific jurisdiction in this case, (1) [NWR] must have made minimum contacts with Texas by purposefully availing itself of the privilege of conducting activities here, and (2) [NWR's] liability must have arisen from or [be] related to those contacts." *Moki Mac*, 221 S.W.3d at 576.

In determining whether a nonresident defendant purposefully availed itself of the privilege of doing business in Texas, we consider "only the defendant's contacts with the forum . . . , not the unilateral activity of another party or third person." *Moki Mac*, 221 S.W.3d at 575. We likewise consider whether the contacts relied on are "purposeful rather than random, fortuitous, or attenuated." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009). "Finally, the defendant must seek some benefit, advantage or profit by availing itself of the jurisdiction." *Id.* "The purpose of a minimum contacts analysis is to protect a nonresident defendant from being haled into court when its relationship with the forum state is too attenuated to support jurisdiction." *Internet Advertising Grp., Inc. v. Accudata, Inc*, 301 S.W.3d 383, 388 (Tex. App.—Dallas 2009, no pet.) (citing *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)). Our examination of these factors leads us to conclude that NWR did not purposefully avail itself of the privilege of conducting activities in Texas.

It is undisputed that NWR is a Georgia company with its principal place of business in North Carolina. It is also undisputed that NWR does not maintain a place of business in Texas and does not have employees or agents in this state and that it is not required to maintain a

registered agent for service in Texas.[12]  MWC and MCW Industries do not contend that NWR's forum contacts give rise to general jurisdiction in Texas.  Instead, the parties join issue on whether NWR is subject to specific jurisdiction in Texas.

NWR entered into subcontracts with MWC and MCW Industries, both of which are Texas companies.  The subcontract with MWC provided that MWC would build cabinets for NWR while the subcontract with MCW Industries provided that MCW Industries would install the cabinets after they had been constructed.  Contrary to the allegations of MWC and MCW Industries, though, the cabinets were not constructed on credit, as the credit application had been expressly rejected.

While it is true that NWR contracted with Texas companies MWC and MCW Industries, we observe "that an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).  To evaluate purposeful availment in the context of a contract, we look to such factors as "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  *Id.*  at 479.

It is apparent from the record that prior negotiations took place regarding the credit application, as previously explained.  Those negotiations led to the execution of the subcontracts

---

[12]In his unsworn declaration, Michael Wilson, the vice president and general counsel of NWR, stated:

> NWR is a limited liability company that is incorporated in Georgia and maintains its principal place of business in Charlotte, North Carolina.  NWR does not conduct any business in Texas, does not own or lease personal or real property located in Texas, does not advertise in Texas, does not maintain a personal or business office, place of business or other facilities or residences in Texas, does not maintain a telephone listing or mailing address in Texas, does not maintain any officers, directors, or employees in Texas, and no owners of NWR live in Texas.  NWR has never applied for or received a loan of money in Texas and does not maintain bank accounts in Texas, and does not owe or pay taxes in Texas.

18

in the absence of agreement on the forum-selection clause in the credit application. From those negotiations, we observe that, because NWR determined not to agree to the forum-selection language in the credit application, it did not wish to be haled into a Texas Court. *See Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 437 (Tex. 1982). More importantly, though, is the fact that both subcontracts included identical arbitration provisions and choice of law provisions. The arbitration provision in each subcontract provided, in pertinent part:

> Any claim or dispute between the Subcontractor and the Contractor shall, at the sole option of the Contractor be determined in accordance with any disputes procedure set forth in the Contract Documents, or at the sole option of Contractor, by litigation or binding arbitration in accordance with the American Arbitration Association's ("AAA") Construction Industry Arbitration Rules, then in effect, and Subcontractor shall be bound by such determination and shall comply fully with the same. Mediation of any claim or dispute shall be conducted prior to litigation or arbitration. At the sole option of Contractor, any such mediation shall also be conducted in accordance with the Mediation Rules of the AAA then in effect; provided, however, that the mediation itself may be conducted by a mediator agreed to by the Contractor and Subcontractor without the need to use the AAA. Such mediation shall be conducted within thirty (30) days of a request by contractor. . . . No claim, dispute, mediation, arbitration or litigation, shall interfere with the progress of the Work, and Subcontractor shall proceed with the Work despite the existence of any claim, dispute, mediation, arbitration or litigation. . . . *The location of any mediation or arbitration proceeding shall be, at Contractor's sole discretion, the Project location or in Charlotte, North Carolina.*

(Emphasis added). Each subcontract also provided that "[t]he validity, interpretation and performance of its Subcontract shall be in accordance with the laws of the State of Georgia."

"[C]hoice-of-law provisions should not be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws.'" *Michiana Easy Livin' Country, Inc. v. Holton*, 168 S.W.3d 777, 792 (Tex. 2005) (quoting *Burger King*, 471 U.S. at 482). NWR's deletion of the forum-selection clause in the credit application is some evidence

19

that it did not anticipate local jurisdiction, and its "insertion of a clause designating a foreign forum suggests that no local availment was intended." *Id.* at 792; *see J.A. Riggs Tractor Co. v. Bentley*, 209 S.W.3d 322, 332 (Tex. App.—Texarkana 2006, no pet.) (forum-selection clause indicated that Riggs anticipated suit elsewhere and was "not availing itself of the benefit of Texas' laws"); *see also EnerQuest Oil & Gas, L.L.C. v. Antero Resources Corp.*, No. 02-18-00178-CV, 2019 WL 1583921, at \*6 (Tex. App.—Fort Worth Apr. 11, 2019, pet. dism'd) (mem. op.) (agreement containing Oklahoma forum-selection clause and Delaware choice-of-law clause suggest that EnerQuest "purposefully avoided" Texas). We, therefore, conclude that the inclusion of a Georgia choice-of-law provision and Georgia (project location) or Charlotte, North Carolina, forum-selection clause in each of the subcontracts indicates that NWR did not attempt to avail itself of the benefits of Texas' laws.

Although each of the subcontracts required MWC and MCW Industries to make application for monthly progress payments to NWR in Charlotte, North Carolina (email, overnight, or hand delivery), the subcontracts did not provide for a place of payment. "When a contract requires the payment of money but does not specify where the payment is to be made, the place of payment is the domicile of the payor." *Accudata, Inc.*, 301 S.W.3d at 389 (citing *Buffet Partners, L.P. v. Sheffield Square, L.L.C.*, 256 S.W.3d 920, 922 (Tex. App.—Dallas 2008, no pet.)).

Finally, there is no evidence in the record of where the subcontracts were performed. Even assuming MWC constructed the cabinets in Texas (to be installed on location in Georgia by MCW Industries), that fact is not outcome determinative. Rather, the "minimum-contacts

20

analysis focuses solely on the actions and reasonable expectations of the defendant." *Turner Schilling, L.L.P. v. Gaunce Mgmt., Inc.*, 247 S.W.3d 447, 456 (Tex. App.—Dallas 2008, no pet.) (quoting *Michiana*, 168 S.W.3d at 790) (concluding that other party's performance of contractual duties in Texas does not constitute purposeful contact by defendant in Texas); *see also Moncrief Oil Int'l v. OAO Gazprom*, 481 F.3d 309, 312 (5th Cir. 2007) (contracting with resident of forum state, combined with contract performance by resident party in forum state, did not establish minimum contacts when non-resident defendant did not perform any of its own contractual obligations in forum state, contract did not require performance there, and purpose of contract centered in Russia). Here, the contract did not require performance in Texas, and the purpose of the contract was centered in Georgia.

Based on the foregoing analysis, we conclude that MWC and MCW Industries have not shown that NWR purposefully availed itself of the privilege of conducting activities within Texas and is thus not subject to specific jurisdiction here. *See Michiana*, 168 S.W.3d at 784–85.[13]

---

[13]As a result of our analysis, we need not determine whether MWC and MCW Industries' causes of action arise from contacts within this state.

## III. Conclusion

Because NWR did not consent to personal jurisdiction in Texas and because it is not subject to specific jurisdiction here, we reverse the trial court's order and remand for further proceedings.

Josh R. Morriss, III
Chief Justice

Date Submitted:    December 30, 2021
Date Decided:    March 1, 2022